## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Jeffrey Stephenson, being first duly sworn, hereby depose and state as follows:

### Affiant Background and Purpose of Application

1. I am a Federal Bureau of Investigation ("FBI") Task Force Officer and have been since October 1, 2017. I am assigned to the FBI's Albany, New York Field Division, Vermont Resident Agency. As an FBI Task Force Officer, I am a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C), authorized to investigate violations of the United States Code under Titles 18 and 21, to include applying for search warrants. I am employed by the Vermont State Police ("VSP") as a Detective Sergeant and am a certified law enforcement officer in the State of Vermont, having been certified by the Vermont Criminal Justice Training Council for over 18 years.

2. In my capacity as an FBI Task Force Officer and Detective Sergeant, I am familiar with federal laws regarding the distribution of, possession with the intent to distribute, and conspiracy to distribute controlled substances. I have been trained in the investigation of violations of those laws, and I have participated in many such investigations. I have applied for and executed search warrants related to those violations, including searches of electronic devices. I have participated in all phases of investigations of those violations, including interviews with users and distributors of controlled substances. As a result of my participation in these investigations, I am familiar with the techniques employed by distributors of controlled substances and their means of acquiring, transporting, storing, preparing, and distributing controlled substances; their means of collecting, transporting, and transferring proceeds of controlled substances; and their means of acquiring, and using controlled substances. Among those investigations, I have specifically

1

participated in the investigation and prosecution of controlled substance crimes in and around the Rutland, Vermont area.

3. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the cellular telephone further described below and in Attachment A (the "Subject Device"), which is in the custody of the Vermont State Police in Rutland, Vermont, and identified as Item # 7 (case number 24H2000630), and to extract from the Subject Device the electronically stored information described in Attachment B.

   a. *Subject Device*: An Apple iPhone, black in color, "Friends" puffy sticker on the back, diamond shape sticker on the back, red/pink flower case with an empty credit card/license holder pouch affixed to the back of it, currently in the custody of the Vermont State Police in Rutland, Vermont, and identified as Item # 7 (case number 24H2000630).

4. The Subject Device was seized from Amy MOLLISON during her arrest pursuant to a federal arrest warrant on October 25, 2024. Based on my training and experience, the Subject Device has been stored in a manner such that the data contained on it is likely to remain intact and in the same condition as it was at the time of the Subject Device's seizure. The applied for warrant would authorize the forensic examination of the Subject Device for the purpose of seizing electronically stored data, particularly described in Attachment B.

5. As set forth herein, I submit that there is probable cause to search the Subject Device for evidence and instrumentalities of violations of 21 U.S.C. §§ 841 and 846, specifically, distribution of controlled substances, and conspiracy to commit those drug offenses.

6. The facts set forth in this affidavit are based on my personal observations and knowledge and may also be based on: (a) my training and experience, (b) information obtained

2

from other individuals participating in the investigation, including Detective Trooper Jesse Dambrackas, (c) reports and/or business records, (d) recorded conversations or text messages, and (e) communications with other individuals who have personal knowledge of the events and circumstances described herein. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of the investigation. Rather, I have set forth facts sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

## Probable Cause

### Background

7.  The government, including the VSP and FBI, are investigating Amy MOLLISON, among others known and unknown, for the distribution of controlled substances and conspiracy to distribute controlled substances in the Rutland County, Vermont, area. MOLLISON is well-known in the Rutland area for her involvement in drug distribution in the Rutland, as evidenced by the below:

   a. On or about November 4, 2022, law enforcement executed a State of Vermont search warrant at MOLLISON's residence, located at 44 Cleveland Avenue, Rutland, Vermont. During the search, officers located approximately 525 grams of suspected cocaine. MOLLISON was subsequently charged with cocaine trafficking in the Vermont Superior Court after the Court found probable cause. (Docket No. 22-CR-10402).

b. On or about March 18, 2023, MOLLISON was arrested for cocaine possession by the Rutland City Police. The Vermont Superior Court found probable cause for this charge. (Docket No. 23-CR-04131).

c. On or about November 4, 2023, VSP troopers stopped a vehicle operated by MOLLISON in Rutland, Vermont. Pursuant to a State of Vermont warrant, troopers searched MOLLISON and the vehicle. Inside MOLLISON's purse, troopers located approximately 2.7 grams of suspected cocaine. Inside the vehicle, troopers located about 16 grams of suspected cocaine. Troopers located a small quantity of suspected cocaine base inside her shoe. MOLLISON was charged in the Vermont Superior Court after the Court found probable cause. (Docket No. 23-CR-10989).

d. On March 29, 2024, Rutland City Police officers conducted a traffic stop of a vehicle operated/occupied by MOLLISON in Rutland, Vermont. Pursuant to a State of Vermont warrant, officers later searched the vehicle finding approximately 24 grams of suspected cocaine inside a purse. MOLLISON was charged in the Vermont Superior Court after the Court found probable cause. (Docket No. 24-CR-03671).

e. On or about June 5, 2024, the Vermont Superior Court dockets listed above were resolved when MOLLISON pled guilty and was sentenced to 0-10 years to serve.

8. Based upon my training and experience, I recognize the offenses described above involve distribution quantities of suspected cocaine.

<u>May 2024 Law Enforcement Encounter</u>

9. On May 20, 2024, Rutland City Police ("RCPD") encountered MOLLISON and William Corey Warner ("Warner") in a parking lot in Rutland. When RCPD ordered Warner exit

4

the vehicle, MOLLISON got out of the driver's seat and Warner slid over behind the wheel. Warner reversed, hit RCPD's unmarked vehicle, and then drove forward striking an occupied parked vehicle. Warner drove out of the parking lot, evading marked patrol units that had activated emergency lights and sirens.

10.   A Vermont State search warrant was issued for the car. The search of the car revealed a black Adidas shoulder-style backpack on the passenger floor containing a plastic bag which contained approximately 35.5 grams (with packaging) of suspected cocaine, and a plastic bag underneath the driver's seat which contained approximately 37.6 grams (with packaging) of suspected cocaine base. The substances tested presumptive positive for cocaine and cocaine base respectively.[1]

August to October 2024 Controlled Purchases

11.   On three separate occasions between August 21, 2024, and October 2, 2024, law enforcement conducted controlled purchases of cocaine base from MOLLISON. During each controlled purchased described below, law enforcement was aided by a confidential informant (hereinafter, "CI")[2].

12.   Each controlled purchase described below followed the same protocol including that law enforcement searched CI and CI's vehicle immediately before and after the controlled purchase(s) (no contraband or money located), a law enforcement surveillance team conducted

---

[1] As a result of this drug seizure, Warner was charged in the Vermont Superior Court after the Court found probable cause for the crime of cocaine trafficking among other offenses. To date, Mollison has not been charged with a crime(s) related to this incident.

[2] CI is a registered informant with the Vermont State Police. CI is cooperating with law enforcement in exchange for monetary payment. CI's criminal history includes the following convictions: violation of conditions of release, unlawful restraint -2nd degree, lewd-lascivious conduct with child, simple assault, criminal sale-controlled substance -3rd: narcotic drug, unlawful fleeing a police officer in a motor vehicle – 3rd degree, and act in manner injure child less than 17, with the most recent conviction being in 2019. CI has admitted s/he used controlled substances in the past.

physical and electronic surveillance of CI during the operation(s), CI was provided with pre-recorded law enforcement funds sufficient to make the purchase(s), and CI followed law enforcement's directions before, during, and after the purchase(s).

13.     CI communicated with MOLLISON through voice call and text message to arrange for the controlled purchases described below. MOLLISON was using the phone number (802) 281-8504. On October 30, 2024, I researched the number using a reliable online open-source law enforcement tool and found it was a Verizon wireless number.

### Controlled Purchase #1

14.     On or about August 21, 2024, law enforcement conducted a controlled purchase of approximately 4 grams of cocaine base from MOLLISON. At law enforcement's direction, CI contacted MOLLISON at the phone number 802-281-8504, a number CI previously identified as belonging to MOLLISON. Detective Dambrackas was present with CI; he monitored and recorded the call. A female voice, who CI identified as MOLLISON, answered and CI asked, "You said 160 on a ball?" to which MOLLISON replied, "Yeah[.]" Immediately before the controlled purchase, law enforcement searched CI and CI's vehicle—no contraband or money was located. CI was provided with electronic surveillance equipment and enough money to make the purchase. Law enforcement monitored CI using electronic surveillance equipment and physical (visual) surveillance throughout the operation.

15.     CI traveled to an agreed upon location in Rutland, Vermont, where CI waited for MOLLISON to arrive. While waiting, MOLLISON called CI again. During this call, MOLLISON could be heard stating, "Just have your bread ready, ok?" Shortly after, law enforcement observed MOLLISON arrive at the location. MOLLISON was with another male, who was later identified as Joseph Siliski. Law enforcement witnessed CI walk to the MOLLISON/Siliski vehicle and

6

interact with them through the car window. Following the meeting, CI returned to the CI's vehicle and departed the area. CI was surveilled traveling to a predetermined meeting location to meet with Detective Dambrackas where CI turned over the suspected cocaine base. Law enforcement searched CI and CI's vehicle—no contraband or money was located. The suspected cocaine base later field-tested presumptive positive for the presence of cocaine base and weighed approximately 4 grams with packaging.

16. Based upon my training and experience, I know the following about the language/phrases used by MOLLISON and CI during the controlled purchases described above:

    a. The phrase: "You said 160 on a ball" is consistent with $160 for a ball (3.5 grams) of cocaine and/or cocaine base.

    b. In the phrase: "Just have your bread ready, ok[,]" the term "bread" is a street term meaning money.

### Controlled Purchase #2

17. On or about August 28, 2024, CI was instructed to set up a controlled purchase of approximately 7 grams of cocaine base from MOLLISON for the following day. CI communicated with MOLLISON via text message at (802) 281-8504. Law enforcement later reviewed and photographed these messages. In the messages, CI advised s/he wanted another "7[,]", and MOLLISON asked if CI wanted it tonight or tomorrow and to let her know as soon as possible, as she was running low.

18. The next day, on or about August 29, 2024, CI contacted Detective Dambrackas and reported s/he spoke to MOLLISON at (802) 281-8504 and MOLLISON still had the 7 grams available for sale and the cost would be $320. Law enforcement conducted a second controlled purchase of cocaine base from MOLLISON on that date.

19. The controlled buy used the same protocol/procedures described above. Law enforcement observed MOLLISON meeting with the CI. After the purchase, CI met with law enforcement and turned over approximately 8.4 grams of suspected cocaine base with packaging s/he purchased from MOLLISON. The substance field-tested presumptively positive for the presence of cocaine base.

### Controlled Purchase #3

On or about October 2, 2024, law enforcement conducted a third controlled purchase of cocaine base from MOLLISON. The same CI communicated with MOLLISON via voice phone call prior to meeting with detectives at (802) 281-8504. CI confirmed MOLLISON was available to meet with CI and sell CI 3.5 grams of cocaine base at a local store parking lot. Law enforcement met with CI and monitored CI as s/he called MOLLISON on speaker phone, however MOLLISON did not answer at first. Moments later, MOLLISON, using (802) 281-8504, sent CI a text message advising, "B there in 6[.]" A few minutes later, law enforcement observed MOLLISON and another male meet with CI in the parking lot. CI later reported that MOLLISON had physically handed CI a package of cocaine base in exchange for the money. The substance field-tested presumptively positive for the presence of cocaine base, and weighted approximately 3.1 grams with packaging.

### Indictment & Arrest

20. On October 16, 2024, a grand jury sitting in the District of Vermont indicted MOLLISON for violations of 21 U.S.C. §§ 841 and 846. A federal arrest warrant issued in conjunction with this Indictment.

21. Pursuant to this federal arrest warrant, members of the VSP and Rutland City Police arrested MOLLISON in Rutland, Vermont, on October 25, 2024. Leading up to the arrest, at

approximately 11:00 a.m. on October 25, 2024, Detective Dambrackas was conducting surveillance of MOLLISON's apartment, located at 44 Cleveland Avenue, Rutland, Vermont. Detective Dambrackas saw a female, who he believed to be MOLLISON, leave the residence, and enter a gray Saturn sedan (the "Saturn Sedan") that had been parked on the street. MOLLISON was alone in the Saturn Sedan. MOLLISON had been observed driving the Saturn Sedan on several occasions prior to October 25, 2024, most recently, on October 23, 2024. Detective Dambrackas followed the Saturn Sedan as MOLLISON drove south on Cleveland Avenue and turned east onto State Street in Rutland, Vermont. As MOLLISON turned the corner, the vehicle did not utilize a turn signal, as required by Vermont motor vehicle law (Title 23 V.S.A. 1064). Vermont State Trooper Jonathan Hall, who was also part of the surveillance/arrest team, was notified of the violation and initiated a motor vehicle stop as the Saturn Sedan turned into the convenience store parking lot at 98 State Street in Rutland City. MOLLISON was identified as the single operator/occupant of the Saturn Sedan and Trooper Hall immediately took MOLLISON into custody.

22.     Detective Dambrackas has reviewed the body worn camera ("BWC") video from Trooper Hall's arrest. The BWC recording revealed that as MOLLISON was exiting the driver's seat of the Saturn Sedan, a cell phone (the Subject Device) was visible and hanging out of her right vest pocket. A purse was visible on the front passenger seat of the Saturn Sedan. No one else was present in the Saturn Sedan during the motor vehicle stop.

23.     While taking MOLLISON into custody, Trooper Hall removed the Subject Device from MOLLISON'S pocket and placed it back into the Saturn Sedan. Moments later, Trooper Hall asked MOLLISON if she wanted the Subject Device to be brought with her, and she answered in the affirmative. Trooper Hall removed the Subject Device from the Saturn Sedan and

9

transported it, along with MOLLISON, to the VSP barracks. MOLLISON acknowledged the Subject Device belonged to her.

24.     After Trooper Hall transported the Subject Device to the VSP barracks, it was seized as evidence pending the application of this proposed warrant. The Subject Device is currently in the custody of the VSP under incident 24H2000630 Item #7.

### Search of Saturn Sedan

25.     Immediately following the arrest of MOLLISON, law enforcement summoned a police canine to the scene. Brandon Police Department Officer Aidan Alnwick and Canine Guinness arrived a short time later. At the officer's command, Canine Guinness scanned the outside of the Saturn Sedan and alerted to the odor of controlled substances. According to Officer Alnwick, Canine Guinness is certified in the detection of methamphetamine, cocaine, cocaine base, MDMA, and imprinted on fentanyl.

26.     Rutland City Police Department Detective Cpl. Adam Lucia then conducted a search of the Saturn Sedan. During the search, Detective Lucia located a purse on the front passenger's seat. Among other items inside the purse, Detective Lucia located the below suspected controlled substances, along with other drug paraphernalia. Detective Lucia brought the purse to the VSP barracks where Detective Dambrackas photographed, weighed/counted, and field tested the seized items.

      a. Plastic zip lock baggie weighing about 12.3 grams (including packaging) containing a white hard substance that field tested presumptive positive for the presence of cocaine base;

b. Plastic zip lock baggie weighing about 9.7 grams (including packaging) containing a white powdery substance that field tested presumptive positive for the presence of cocaine;

c. 4 orange pills in a plastic baggie that had Batman logos on the baggie. The pills were preliminarily identified as Buprenorphine (a prescription opiate addiction treatment medication);

d. 8 sublingual films preliminary identified as containing Buprenorphine,

e. An amount of an unknown white powdery substance in an unmarked prescription pill bottle; and

f. 43 10 milligram Oxycodone Hydrochloride pills in an unmarked prescription pill container along with 6 30 milligram Oxycodone Hydrochloride pills in a plastic baggie within the same unmarked prescription pill container.

27. In addition to the above, $307 in US Currency was also found within the purse. The currency was returned to MOLLISON before she was transported to the jail.

28. Based upon my training and experience, I know that the amounts of suspected controlled substances seized from the purse in the Saturn Sedan are not typically user quantities, but are more consistent with possession with the intent to distribute the substances.

29. During arrest and processing procedure, MOLLISON claimed that she owned a black Cadillac ATS and did not own the Saturn Sedan. She stated the Saturn Sedan was owned by a someone else, and that she did not know the person's last name. However, as discussed above, law enforcement observed MOLLISON operating the Saturn Sedan on October 2, 2024, with a male passenger, and again on October 23, 2024, by herself. Further, law enforcement observed the Saturn Sedan parked at MOLLISON's residence multiples times in October 2024.

**Training and Experience Relevant to Drug Trafficker Cellular Phone Use**

30.     If this search warrant is granted, the Subject Device will be examined by a law enforcement officer or digital forensic specialist. The examination of the Subject Device will include a physical search of the device via the use of a proprietary data extraction device. This type of search may result in the recovery of data that has been previously deleted (including the recovery of deleted text messages and/or web browsing data). In some cases, subject to the type of file/disk encryption, previously deleted data may be recovered, unless the data has been over-written by the addition of new content on the Subject Device. I know that most modern mobile communication devices (especially smart phones) have large storage capacities, which dramatically increases the likelihood that the previously deleted data has not been over-written with new content and is, therefore, recoverable.

31.     In my experience investigating narcotic possession and trafficking offenses, I have found that electronic devices such as cellular phones similar to the Subject Device are commonly used to facilitate domestic trafficking of illicit narcotics. Traffickers often use these devices to coordinate procurement, sales, transport, and distribution of their illegal commodities, as well as the distribution of proceeds related to those offenses. In my experience, traffickers often use more than one cell phone; for example, they may use one cell phone to communicate with drug customers, another cell phone to communicate with drug suppliers, and/or another cell phone for personal purposes. In my experience, traffickers often use third party cellular phone applications such as WhatsApp, Facebook Messenger, Snapchat, Telegram, etc. such that when data acquired from recipients of the communications or from the service providers, it may be difficult to attribute those data to a particular sender. Further, such services often use levels of encryption to protect the content and context of their communication. Examination of such electronic devices seized

directly from the suspected trafficker or possessor of controlled substances can lead to attribution of those communications to the possessor(s) of the devices.

32. I understand based on my training and experience that both distributors and users of controlled substances frequently retain contact information about, historical messages with, and other data regarding their sources and customers of controlled substances in their cellular phones. Evidence of controlled substance transactions on cellular phones often includes logs of calls, text messages (both within the phone's text messaging application and third-party applications such as WhatsApp and Facebook Messenger), contact lists, photos, and notes in various applications. The phone data frequently establishes details of specific drug transactions, such as the date, time, quantity, cost, and means of payment, including payments through cellular phone applications such CashApp, Venmo, or cryptocurrency transactions. Communications stored or logged on the phones may also contain evidence of alleged debts owed to the sources of controlled substances.

33. In my training and experience, drug distributors and users frequently use their cellular phones to navigate, including to and from distribution locations and/or source cities, using global positioning system (GPS) access. Most current cellular phones have a mapping application that provides location information and directions for navigation, and additional navigation applications are available for download. Users frequently take screenshots of a map application to show others where they are or where to meet and send the images via a messaging application; alternatively, some mapping applications allow the user to send location data directly through a "pin drop." Evidence of drug storage or distribution locations therefore may be found in a phone's mapping applications, image database, and messaging applications.

In my training and experience, drug distributors also frequently photograph and send images of their products to users as a means of advertisement to their customers. They also frequently

photograph and send images of the proceeds from drug sales. Such images may appear in messages between the distributor and users in various applications, and may be stored on the device.

34. As further described in Attachments A and B, this application seeks permission to locate not only digital files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the Subject Device was used, the purpose of its use, who used it, and when. There is probable cause to believe this forensic electronic evidence will be on the Subject Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how an electronic device was used, the purpose of its use, who used it, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a mobile communication device (like the Subject Device) is evidence may depend on other

information stored on the mobile communication device and the application of knowledge about the functioning of a mobile communication device. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

35. Further, in finding evidence of how a mobile communication device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

### Conclusion and Requests

36. For the reasons described above, I submit there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846, specifically, distribution of controlled substances, possession with intent to distribute controlled substances, conspiracy to commit those drug offenses, will be located on the Subject Device. I respectfully request the issuance of a search warrant authorizing the examination of the Subject Device, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

37. Because this warrant seeks only permission to examine the Subject Device, which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize the execution of the warrant at any time in the day or night.

Dated: November _____, 2024.

                                            Jeffrey W. Stephenson
                                            Task Force Officer
                                            Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime, on November 8th, 2024.

_____
HON. KEVIN J. DOYLE
U.S. MAGISTRATE JUDGE